1:19 MJ 9194

## Affidavit in Support of Criminal Complaint

I, Paul T. Fregosi, a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice, being first duly sworn, depose and state under oath as follows:

1. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, violations of Title 21, United States Code, Sections 841, 843(b), and 846, as well as violations of Title 18, United States Code, Sections 1956 and 1957, and other federal law violations.

2. This affidavit is made in support of a criminal complaint against Luisa Margarita SAPIENS VILLA for:

   (a) for knowingly and intentionally distributing, and possessing with intent to distribute, a controlled substance, (fentanyl, a Schedule II controlled substance), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

## Training and Experience

3. I am employed as a Special Agent with the DEA and have been so employed since February 2017. I am currently assigned to the DEA's Detroit Field Division, Cleveland District Office Group One. Prior to becoming a DEA Special Agent, I was employed with the Milton Police Department (Georgia) for

approximately 7 years, and for 4 of those years, I was assigned as a DEA Task Force Officer.

4.   Upon joining the DEA, I received approximately 20 weeks of training at the DEA Training Academy in Quantico, Virginia.  This training addressed the methods by which drug traffickers possess and distribute controlled substances; the manner and means in which they conceal and launder the proceeds from the distribution of controlled substances; the manner and means in which they protect their proceeds and their controlled substances; and the manner and means by which drug traffickers attempt to avoid law enforcement detection of their activities.  The controlled substances as to which this training applied included, but were not limited to, marijuana, cocaine, heroin, and methamphetamine.

5.   During my law enforcement career, I have participated in numerous search, seizure and arrest warrants pertaining to the seizure of all types of criminal evidence, such as illegal drugs, drug paraphernalia, drug records, drug proceeds, and evidence of other types of crimes and arrests of individuals involved in drug trafficking activities.  I have received training in the enforcement of drug laws, with an emphasis on drug trafficking and drug organizations.  I have participated in multiple drug cases, some of which have been Title III investigations, involving drug trafficking activities and have become familiar with the patterns of activity of drug traffickers, the types and

amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.

6. During my law enforcement career, I have received hundreds of hours in specialized training in the enforcement of the drug laws, the investigation of drug trafficking and drug organizations, in drug recognition and terminology, interviewing techniques, financial/money laundering investigations, and the use of electronic surveillance. I have also participated in numerous drug-related investigations, involving the following types of drugs: heroin, cocaine and cocaine base, methamphetamine and crystal methamphetamine, fentanyl and fentanyl analogues, prescription and counterfeit prescription drugs, and marijuana. I am familiar with and have been involved in all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation and undercover operations. I have participated in Title III investigations, including investigations involving Mexican national drug trafficking organizations and drug traffickers.

7. From my participation in these investigations, I have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings. Based upon my training and experience, interviews conducted with defendants,

informants, and other witnesses to, or participants in, drug trafficking and money laundering activity, I am familiar with the ways in which drug traffickers and money launderers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs, and the ways that drug traffickers and money launderers use cellular telephones, digital display paging devices, and calling cards to facilitate their activity. Drug traffickers and money launderers also use numerical codes and code words to conduct their transactions. In my experience, drug traffickers and money launderers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their activities from law enforcement. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, and the use of off shore accounts.

8. Similarly, I am aware that drug traffickers routinely use and have at their disposal multiple vehicles registered in fictitious names and/or the names of third parties. In addition to concealing their drug trafficking activities, the use of vehicles in this manner is also an attempt to conceal assets from law enforcement in order to prevent the forfeiture of those assets.

9. In addition, I have consulted extensively with other experienced agents regarding drug trafficking activities. As a result, the knowledge that I have

obtained during my law enforcement career has been further informed by other law enforcement agents with experience conducting drug investigations.

### Sources of information

10. I make this affidavit based upon: information that I have learned from discussions with other investigators; my participation in this investigation; and the review of a recorded interview.

### Probable Cause

11. On July 11, 2019, Special Agents (SA's) and Task Force Officers (TFO's) of the DEA were conducting criminal interdiction at the Greyhound Bus Station, 1465 Chester Avenue, Cleveland, OH 44114. Agents were dressed in plain clothes working in an undercover capacity.

12. At approximately 11:21 p.m., agents encountered a Hispanic female wearing a black shirt and blue jeans, carrying a black and white striped bag, a purse, and a pillow. TFO Edwin Cuadra and SA Heather Grimes approached the Hispanic female and identified themselves as Law Enforcement by displaying their badge and credentials. TFO Cuarda is fluent in Spanish and began to speak with the Hispanic female in Spanish. TFO Cuadra asked the Hispanic female if she was willing to speak with agents to which she affirmed.

13. TFO Cuadra asked where she was traveling from and where she was going. The Hispanic female advised she was coming from Phoenix, Arizona and traveling to Cleveland, Ohio to visit friends. TFO Cuadra knows from his training and experience that Arizona is a source state for controlled substances.

TFO Cuadra asked if he could see her bus ticket to which she provided. After examining the ticket, agents returned the ticket and asked if she had identification. The Hispanic female provided agents with a Mexican Passport, identifying herself as Luisa Margarita SAPIENS VILLA. TFO Cuadra asked SAPIENS VILLA if she was carrying any illegal contraband to include large sums of money, pills, or marijuana to which SAPIENS VILLA advised, "no." TFO Cuadra asked SAPIENS VILLA if she would give agents consent to search her belongings to which SAPIENS VILLA verbally gave agents consent to search her belongings. Prior to searching her belongings, TFO Cuadra asked if SAPIENS VILLA would be willing to move to a private room in the bus station for privacy to which SAPIENS VILLA agreed.

14. Once inside the private room, SA Grimes conducted a pat down to ensure SAPIENS VILLA was not carrying any weapons on her person. SA Grimes then conducted a search or her purse and carrying on bag. SA Grimes then picked up SAPIENS VILLA's pillow and felt an unknown object inside. SA Grimes unzipped the pillow case revealing the foam pillow insert. SA Grimes observed several plastic bags containing round, blue, tablets stuffed inside the foam pillow.

15. TFO Cuadra then placed SAPIENS VILLA under arrest. TFO Cuadra verbally advised SAPIENS VILLA of her *Miranda Warnings*. SAPIENS VILLA was transported to the DEA Cleveland Office for further investigation.

16. Once at the DEA office, a further search of the pillow revealed 6 plastic bags containing a large amount of round, blue, tablets marked M 30 (coded to be Oxycodone). The total weight of the tablets was approximately 688 grams.

17. While at the DEA Office, an interview was conducted with SAPIENS VILLA. TFO Cuadra and TFO Maria Matos spoke with SAPIENS VILLA. Both TFO Cuadra and TFO Matos are fluent in Spanish and conducted the interview. SAPIENS VILLA was advised of was read her *Miranda Warnings*, to which SAPIENS VILLA advised she understood and was willing to answer questions by agents.

18. SAPIENS VILLA advised on or about July 7, 2019, around midday, she received a telephone call from an unknown male (UM-1) asking if SAPIENS VILLA was going to do the job to which she responded, "yes." UM-1 told SAPIENS VILLA a different unknown male (UM-2) would be contacting her.

19. On or about July 8, 2019, UM-2 contacted SAPIENS VILLA in the morning. UM-2 told SAPIENS VILLA UM-2 had to meet with SAPIENS VILLA to give her something. UM-2 instructed SAPIENS VILLA to meet her at 59th Avenue and Thomas Road in Phoenix, Arizona. During the meeting, UM-2 provided SAPIENS VILLA with a pillow and $500.00. UM-2 instructed SAPIENS VILLA to get a bus ticket to Cleveland, OH. UM-2 further advised SAPIENS VILLA was to get paid $3,000.00 once the job was done.

20. SAPIENS VILLA advised she was instructed to give the pillow to the person that would pick her up from the bus station and would receive the money from the person that picked up the pillow. SAPIENS VILLA advised she was

told she would be bringing "aguas," which investigators known is a code name for illicit drugs.

21. My colleagues and I have encountered numerous seizures of round, blue, tablets marked M 30. Lab results have revealed these blue tablets contain fentanyl. I am aware these blue tablets are often marketed and sold as prescription Oxycodone tablets, but are in fact counterfeit. I believe based upon recent seizures and trends in the Cleveland, OH area that the blue tablets seized from SAPIENS VILLA will contain fentanyl. The blue tablets have been submitted to the Cuyahoga County Regional Forensic Science Laboratory for analysis and results are pending.

## Conclusion

22. Based upon the evidence and the facts set forth in this affidavit, I submit that there is probable cause to believe that Luisa Margarita SAPIENS VILLA did knowingly and intentionally distribute, and possess with intent to distribute, a controlled substance, (fentanyl, a Schedule II controlled substance), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); in the Northern District of Ohio and elsewhere.

Further Your Affiant Sayeth Not

*(signature)*

_____
Paul T. Fregosi
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this __12th__ day of July, 2019.

*(signature)*

_____
William H. Baughman, Jr.
United States Magistrate Judge
Northern District of Ohio
Eastern Division

